[No. 1977.]

### JOHN AETO v. THE STATE.

1. MURDER — SELF-DEFENSE — CHARGE OF THE COURT.— That the defendant, if unlawfully attacked by the deceased, is not bound to retreat in order to avoid the necessity of killing his assailant is a part of the law of self-defense, and failure to so instruct the jury, when the facts in evidence require the instruction, is material error, notwithstanding the failure of the defendant to except to the omission.

2. SAME.— The charge of the court in this case, upon the subject of self-defense, is otherwise defective, in that it required the jury, in order to render the killing justifiable, to believe, from the evidence, that the defendant fired the fatal shot under the influence of terror.

3. SAME — IMPERFECT RIGHT OF SELF-DEFENSE — MANSLAUGHTER.— A defendant upon trial for murder cannot claim that the killing was in self-defense, if, intending to kill the deceased, he entered upon the premises of the deceased and provoked the occasion which resulted in the homicide. If, however, he was a mere trespasser upon the premises of the deceased, and provoked the occasion which resulted in the homicide, without any intent to kill the deceased or do him serious bodily injury, and without intent to commit any felony, he would not be deprived wholly of the right of self-defense, but such right would be only partial and imperfect, and could operate no further than to reduce the homicide to manslaughter. See the statement of the case for evidence *held* to demand of the trial court a charge upon such phases of the case.

4. SAME.— See the statement of the case for a charge upon the law of manslaughter *held* correct.

APPEAL from the Criminal District Court of Galveston. Tried below before the Hon. Gustave Cook.

Under an indictment which charged him with the murder of Frederick Tate, in Galveston county, Texas, on the 12th day of August, 1883, the appellant was convicted in the second degree, his

punishment being affixed at a term of fifteen years in the penitentiary.

Mrs. Emily Tate, the widow of the deceased, was the first witness for the State. She testified that at the time of the killing she and her husband lived in a house near the center of a block on Eighth street, between Winnie and Church streets, in the city of Galveston, Texas. The deceased usually slept on a pallet spread at the door of the house, which fronted Eighth street; the witness on a bed in the room into which that door led. On the night of the killing they retired as usual, the witness to sleep on the bed and the deceased on the pallet on the floor in the doorway. At about fifteen minutes past 12 o'clock the witness was awakened by choking sounds, which she thought proceeded from her husband's pallet. She presently heard her husband ask: "Who's there?" Witness then raised her body in bed, and saw the form of a man in the doorway, the deceased rising with him as if trying to push him off. The man then seemed to back out, and the deceased to follow him. Witness was then unable to recognize the man, but could see his shape or shadow in the doorway. Springing from her bed, the witness rushed to the door, and just as she reached it she saw John Arto, the defendant, fire a pistol. Witness saw the pistol, the hand and the side of the man's face, and knew that man to be the defendant. She recognized the defendant in the moonlight and by the flash of the pistol. When he fired, the defendant was standing about five feet north of the gate. His pistol was pointed and fired south. The distance from the door in which the witness stood to the point from which the defendant fired was eight or nine feet. Witness did not see her husband at the precise time that the pistol was fired, and could not, therefore, say that the pistol was fired at the deceased or that the ball then fired struck him. When the pistol fired, the witness's daughter Laura, who occupied a room adjoining witness's, ran into witness's room, caught the witness, pulled her back into the room, and shut the door. As she closed the door witness said to her: "John Arto has shot your father." Witness remained in her room some fifteen minutes, then opened the door and went out; took up deceased's pants, and went out to look for him. She found him lying on the street, face down, dead. He had a sheet around him. Witness took the dead man's head on her arm, and sent her daughter Laura after Mr. Talbot.

The defendant, in company with a man whom the witness did not know, passed the house of the witness about half-past 8 o'clock in the evening on the day of the night of the killing. The deceased

was then sitting on the gallery, and the witness was standing in the door. Some two or three days before the killing the witness's daughter, now dead, who had been living with the defendant as his wife, though then unmarried, came to the witness's house from Houston, where she and Arto had been living. She and Arto had quarreled in Houston, and she had come to witness's house, the witness supposed, for protection. As the witness had no room in her house to accommodate her, she procured a room on the opposite side of the street, and she and her children took their meals at witness's house. That daughter of the witness was the step daughter of the deceased. Deceased and defendant had not spoken for three years, but deceased told witness's daughter, when she came from Houston, that she and her children would always be welcomed at his house. The daughter of the witness and the defendant were married prior to the former's decease. The moon was just going down when the fatal shot was fired. A lamp, turned low, was burning in the witness's room. Witness saw and recognized the defendant as the man who shot and killed the deceased. The fatal ball entered the left cheek of the deceased.

On her cross-examination the witness stated that she testified before the coroner's inquest over the body of the deceased, and on the former trial of this case. The defense then read from the witness's testimony at the inquest the following extract: " The body before me is that of my husband. I know only this in relation to my husband's death. It has been my husband's habit of sleeping upon a pallet on the floor with his little son, in front of the door. Last night he slept there as usual. About half-past 12 o'clock this morning, I was awakened by a noise that sounded to me as though some one was choking, and I heard my husband say: 'I will catch you, d—n you.' Thereupon he threw his sheet about him and started out after the intruder, the shadow or shape of whom I could see. In a few seconds afterwards I heard a pistol shot. I went outside, and found my husband, face downward, dead. It is my firm belief that John Arto, of Houston, killed my husband." This extract, the witness admitted, was in substance her testimony before the coroner's inquest. She said nothing before the inquest about seeing the defendant about her premises, because of the request of Mrs. Arto, her daughter, not to do so. She denied that, on the night of the killing, she told Mr. Talbot she believed a burglar killed the deceased. She did tell Talbot that if Arto was in town, he was the man who killed the deceased, and that the trains ought to be guarded to prevent or arrest his flight. She did not ask

Frank Smith if Arto was in town, nor tell Smith that if Arto was in town, he was the man who killed deceased. She did not, on the day after the killing, say in the presence of Mrs. Crossman, Mrs. Frank Smith and Mrs. Richardson, that she did not know who killed her husband but thought the murderer was a burglar or robber, unless the defendant was in town, in which event it was her opinion that he was the man who did the killing. Witness saw the defendant fire his pistol, but did not claim that she saw him kill the deceased. Witness did not see the deceased when shot, either on the street or sidewalk, although her view was in no wise obstructed. Witness did not testify on the former trial of this case that, after the shooting, the defendant ran off up Eighth street in a south-easterly direction. She did hear some one, just after the shot was fired, running north down Eighth street.

Laura Desautelles testified, for the State, that she was living at the house of her step-father, the deceased, at the time of the killing. The deceased and his wife, the witness's mother, occupied the front room of the house, the door of which fronted on Eighth street. The deceased slept on a pallet spread on the floor in the front door, and his wife in a bed in the front room. The room witness occupied was a side room to the house which stood immediately in the rear of the said front room. Witness's sister, who slept with witness on the night of the killing, awakened witness, by kicking her, about 12 o'clock. Witness then heard a noise which sounded like some one choking. She then heard her father say, three different times: "G—d d—n you, I will get you yet." Thereupon the witness sprang out of bed, ran into the said front room, and saw the defendant spring backwards from the front step towards the gate, her step-father, the deceased, pursuing him. The witness knew that the party who sprang backwards from the front step towards the gate was the defendant. Witness ran back into her room to dress, and while there heard a pistol shot. She then ran back into the front room, and out of it, and caught her mother and pulled her back into the room, closed the doors and windows, and the two remained in that room about twenty minutes, when the witness's mother went out on the street to look for the deceased. She found him on the street, dead. Some time before the killing witness heard John Arto, the defendant, threaten to kill the deceased.

Cross-examined, the witness testified that she saw nothing in the hands of the defendant when he jumped from the step to the gate. He was attempting then to do nothing that the witness could see except to back out of the gate. The deceased was then rapidly

pursuing him.   Witness did not see the shot fired.   She could not state the distance between the room occupied by her and that occupied by her mother and her step-father.   Witness did not testify before the coroner's inquest on the night of the killing.   Witness heard the coroner ask her sister if she knew anything about the killing, and heard her sister reply in the negative, but she did not inform the coroner what she, witness, knew of it.   She did testify before the adjourned session of the coroner's inquest, which convened on the next day.   Witness's mother did not, when witness caught and pulled her into the room, just after the shooting, say to witness: "John Arto has killed your father."   She said nothing about Arto at that time.   Arto's threat referred to by witness was that "if the deceased tackled him again, he would kill him."

Hiram Davis testified, for the State, that he passed down Ninth street, in Galveston, on the night that Tate was killed.   He noticed a man going down the railroad track, who appeared to be watching him.   He finally approached near enough for witness to see that he was a white man, and wore a plug hat, dark coat and light vest and pants.   That man was then on Ninth street, and was accessible to Tate's house through a neighboring alley.   That man shortly disappeared, and witness went on to his mother's house at the corner of —— street, where he remained a while, and then went to the corner of Tenth and Postoffice streets.   While there the witness heard the report of a gun, which, judging from the sound, was fired in the neighborhood of Eighth street.   Presently the man whom witness saw some time before on Ninth street passed witness on the corner of Postoffice and Tenth streets.   He was running from the direction of Eighth street towards the bay shore.   Witness saw the defendant at the inquest next morning, and took him then to be the same man he saw on the previous night, first on Ninth street and again, in flight, at the corner of Tenth and Postoffice streets. He was of about the same height, and wore clothes in every way similar.

Joseph Desautelles testified, for the State, that after the release of the defendant on bail by the examining court, and after the defendant's return to Houston, he, the defendant, told him, witness, all about the killing of Tate.   He said to witness: "I killed that d—d old son-of-a-b——h.   I shot him with a forty-four caliber, five feet in front of his gate."   Defendant made this confession to the witness, in the fifth ward, in Houston, Texas, one night on the way to their homes from that ward, after they had been drinking beer together.

Cross-examined, the witness stated that he testified as a defense

witness on the former trial of this case. He testified on that trial that, subsequent to Arto's arrest, he, witness, married Arto's sister-in-law, and that, being a member of Mrs. Tate's family, he had heard Mrs. Tate and his wife discuss the killing of the deceased. Witness testified on that trial, and adheres to the statement, that he heard his mother-in-law, Mrs. Tate, say, after the killing, that she did not know who killed her husband, but that, on the trial, she was going to swear that he was killed by John Arto, and that she intended to put the rope around Arto's neck if it sent her soul to h—ll. Mrs. Tate made that declaration in the presence of her daughter Laura, the witness's wife, and Laura did not then say whether or not she knew anything about the killing. Witness told his wife not to go to court and swear to a lie; that if she did go she must tell the truth. Witness went to Houston and told Arto's attorney about Mrs. Tate's declaration. Witness and his wife were not then living together, and witness told the attorney that he wanted a divorce. The attorney advised witness not to proceed for a divorce until after the trial of Arto, when, if witness had grounds for divorce, he would get it for witness without a fee, provided witness would remain either in Houston or Galveston, accessible as a defense witness on Arto's trial. Witness told one of Arto's attorneys that he had no money to defray the expenses of a divorce proceedings, and the attorney promised to obtain the divorce without charge.

Up to and including the time of Arto's confession to witness, friendly relations existed between them. Subsequently those relations changed and became unfriendly. Arto on one occasion ordered witness out of his house. On another he had witness arrested for threatening his life, and witness had him arrested on a like charge. When Arto ordered witness out of his house witness did not say to Arto, "D—n you, I will fix you for this." Witness told Mrs. Tate of Arto's confession to him, and it was through her that the fact of the confession became known to the prosecution. Witness was in attendance upon the last term of court. He afterwards went to Uvalde county, whence he was brought under attachment to testify on this trial. There was nothing said by either Arto or witness preliminary to the confession. Arto merely remarked, while on the way home from the fifth ward in Houston: "You are a friend of mine. I am going to tell you something that will astonish you," and then made the declaration or confession recited by witness. It was subsequent to this that witness was arrested upon Arto's complaint.

Re-examined, the witness stated that he never told the district attorney anything about Arto's confession. He did not tell the sheriff of Galveston county where he could be found. He was not brought back to Galveston by the sheriff of Galveston, but by the sheriff of Harris county. Witness did not want to testify for the State in this case. Witness wrote one letter to Mrs. Woolfe, Arto's sister, and supposed that it was through her that his presence in Uvalde county became known.

Annie Tate testified, for the State, that she was asleep when her father was killed, and knew nothing of the circumstances attending the tragedy. Mrs. Tate, witness's mother, waked witness and told her to go for Mr. Talbot; that John Arto had killed witness's father. Witness went for Mr. Talbot, who came to Tate's house. The State rested.

Doctor J. McK. Johnson testified, for the defense, that he made a post-mortem examination of Tate's head on the morning after the killing. The fatal ball entered in front of the left cheek, passed upward and backward through the brain, and lodged at the base and back of the brain, completely shattering the base of the brain. The effect of such a wound would be to completely paralyze and instantly stop all motion or locomotion, except what is termed involuntary motion. If a person so shot is, when struck, walking or running, he will fall instantly, and only go so far forward as the momentum of his body would carry him, which would not be more than one step. It was the opinion of the witness, as a medical expert, that the deceased fell from the effect of the shot described on the exact spot where he was when the bullet struck him if he was standing still, or, if he was running when struck, he fell not exceeding three feet from the place his body occupied when struck. If the base of the brain be shattered, locomotion stops and the stricken person will drop instantly. On his cross-examination the witness stated that he had known people to run considerable distances after being shot through other parts of the brain than the base, but never when the base was shattered.

Richard Talbot was the next witness for the defense. He testified that his house and the house occupied by the deceased when killed were parts of the same block of buildings. On the night of the killing witness was awakened by a shot fired, as indicated by the sound, near Tate's house on Eighth street. Some thirty minutes later Tate's daughter came to witness's house and asked him to go to her father's house. On his way out of his house, witness looked at his clock and saw that it indicated ten minutes to 1 o'clock.

Witness went immediately to Tate's house, and thence to a place indicated by Mrs. Tate, with Mrs. Tate, where he found the dead body of the deceased, lying face down. The body lay in the middle of Eighth street. A quilt was wrapped around the body, the hands grasping it firmly. There were no clothes other than a shirt on the body. Witness was the first to touch and examine the body. He found a bullet-hole in the left cheek and a pool of blood in the sand immediately under the wound. There was no blood on the face or other part of the body, nor on the shirt. The right leg lay flat on the ground, and the left was raised as though in the act of taking a step forward. The body was taken up and removed to the house, where an inquest was subsequently held. Upon his arrival at the point where the body lay, the witness asked Mrs. Tate how the deceased came to his death, and if she knew who would or could have been likely to be the agent of his death. She replied that he must have been killed by burglars or robbers; that she heard the deceased run out of the house after some one who she supposed must be a burglar, and that he was shot while chasing him. Witness remarked to her that he thought she and her husband and family were too poor to tempt the cupidity of burglars, and that he did not think a burglar killed deceased. Mrs. Tate replied that her daughter had recently obtained a new watch and chain, and that they had since then been apprehensive of burglars. After a short time Mrs. Tate remarked: "Before my God, Mr. Talbot, if John Arto is in town he killed my husband." The body of the deceased lay thirty-six feet from his gate as measured by the steps of the witness. It lay just north of the gate and in the middle of the street. Witness did not measure the short distance from deceased's gate to his front door. Frank Smith, his wife and, the witness thought, other parties reached Tate's house shortly after witness's conversation with Mrs. Tate. Mrs. Tate then, in witness's presence, asked Frank Smith if John Arto was then in Galveston. Smith answered that he was, and that he, Arto, left him, Smith, at 10 o'clock that night. Mrs. Tate then said: "Before God, John Arto killed my husband." Witness subsequently heard her say to several parties that Arto killed her husband. Witness was called to Tate's house fully thirty minutes after he heard the shot.

Mrs. Crossman was the next witness for the defense. She testified that she went to Tate's house soon after the shooting. On being asked who killed her husband, Mrs. Tate, in the hearing and presence of the witness, said that she did not know; that deceased had no enemies in Galveston that she knew of, and that he must

have been killed by a burglar he was pursuing. Witness looked over to Tate's house when she heard the shot, but saw no light in that house. She, however, heard some one call for a lamp to look for Tate's pants and his body. Mrs. Tate said nothing, that the witness heard, of Arto killing the deceased until after Frank Smith arrived, and told her that Arto was in town. Before Smith's arrival Mrs. Tate said that she had heard it asserted that if a mirror be placed before the eyes of a murdered man, the image of the murderer would be reflected on the glass.

Frank Smith testified, for the defense, that he and his wife went to Tate's house shortly after the shooting. Mrs. Tate asked witness if Arto was in the city that evening. Witness replied that he had separated from Arto about 10 o'clock. Mrs. Tate then said: "Before God, it is he who killed my husband." She said nothing about Arto in connection with the killing until informed by witness that Arto was in town. Witness's wife was present. Mrs. Frank Smith, who was a sister to Mrs. Tate, corroborated her husband.

Frank Smith stated on his cross-examination that when Arto left him at 10 o'clock on that night, he said he was going to try to catch the late train to Houston, and that if he failed to catch it he would rejoin witness at Tolix's garden and stay all night with him. He did not return.

John Tolix testified, for the defense, that defendant was at his beer saloon at the foot of East L street, on the night of the killing. He left that saloon near the hour of 10 o'clock, saying that he was going to try to get transportation to Houston that night; that if he failed he would come back. He returned a few minutes before 12 o'clock and remained until witness closed, which he did at twenty minutes before 1 o'clock. On his cross-examination witness stated that he could give no reason why he looked at his clock when he closed his saloon on the night of the killing. That clock was twenty minutes fast.

Odelia Arto, a sister to the defendant, testified in his behalf that she was present in her brother's house in Houston when Joseph Desautelles was ordered out of that house by the defendant. Desautelles had used some vulgar and indecent language to the witness. Defendant told Desautelles that he intended to have him arrested for his language, and shortly afterwards did cause his arrest. On leaving the house Desautelles said: "D—n you, I'll fix you for this." The defense closed.

A. Redo testified for the State, in rebuttal, that he assisted in the arrest of the defendant, at about forty-five minutes after 4 o'clock,

A. M., August 14, 1883.   He had on his person, when arrested, the pistol in evidence, one chamber of which was empty.   The same pistol was identified by Gribble and Royston, as the one taken from Arto after his arrest, since which time it had been in the custody of the sheriff.

The charge of the court upon the subject of manslaughter, referred to in the fourth head-note of this report, reads as follows: "Unless you believe from the evidence that by reason of anger, rage, resentment or terror, suddenly excited in defendant, he was rendered incapable of cool reflection, and, under the immediate influence of it, he intentionally, but unlawfully, *and without any reasonable grounds for apprehending immediate danger of serious bodily injury or death to himself,* shot and killed Frederick Tate with a pistol, and the same was a deadly weapon as used, then he would be guilty of manslaughter and you should so find."

The motion for new trial raised the questions discussed in the opinion.

*Jones & Garnett* and *J. B. Stubbs,* for the appellant.

*J. H. Burts,* Assistant Attorney-General, for the State.

Willson, Judge.   I. In the opinion of the learned trial judge the evidence justified and demanded a charge upon the law of self-defense, and he accordingly gave a charge thereon, but this charge does not embrace all the law upon the subject applicable to the evidence in the case.   It omits to instruct the jury that the defendant, if unlawfully attacked by the deceased, was not bound to retreat in order to avoid the necessity of killing his assailant.   (Penal Code, art. 573.)   We concur with the trial judge in the opinion that a charge upon the law of self-defense was not only warranted but required by the facts in proof, and we further hold that a material part of said law, particularly applicable to such facts, is the provision above cited, and which was entirely omitted from the charge given to the jury.   The omission to give such a charge was, we think, material error calculated to injure the rights of the defendant, and therefore constitutes cause for reversal, although not excepted to at the time.   (*Bell* v. *The State,* 17 Texas Ct. App., 538.)

II. Another defect in the charge upon the law of self-defense is that it required the jury to believe from the evidence that the defendant fired the fatal shot under the influence of *terror,* in order to render the killing justifiable.   This is a limitation of the right of

self-defense which we do not find in the statute or in any of the adjudications upon the subject. In our opinion a party assailed, although not terrified by such assault, might still be justified in protecting himself by killing his assailant. We do not think that the right of self-defense in any case depends upon whether or not the person assailed acts under the influence of *terror* in killing his assailant. *Terror* signifies more than *alarm or fright*. It is agitating and excessive fear, which usually benumbs the faculties. (Webs. Dic., " Alarm ;" "Terror.") It is one of the passions, the existence of which will sometimes reduce a homicide from murder to manslaughter, but it is never, necessarily, an element of self-defense. If it were, the right of self-defense would not attach to the brave, but could be invoked only by the timid.

III. In our opinion there are phases of self-defense presented by the evidence which the charge of the court omits to notice. If the defendant, intending to kill the deceased, entered the house of deceased, and provoked the occasion which resulted in the homicide, he cannot claim that the killing was in self-defense. If, however, the defendant was a mere trespasser upon the premises of the deceased, and provoked the occasion which resulted in the homicide without any intent to kill the deceased or do him serious bodily injury, and without intent to commit any felony, in such case he would not be deprived wholly of the right of self-defense, but such right would be only partial and imperfect, and could operate no farther than to reduce the homicide to manslaughter. (*King* v. *The State*, 13 Texas Ct. App., 277; *Jones* v. *The State*, 17 id., 602.) We are of the opinion that the charge should have submitted to the jury the above mentioned phases of the case.

IV. In other respects than those we have named, we think the charge of the court is correct and sufficiently clear to enable the jury to properly understand the law governing the issues submitted for their determination. A careful consideration of the charge upon the law of manslaughter has satisfied us that the objections thereto urged by defendant's counsel are not sound. Whilst the charge upon this issue is very concise, it nevertheless, in our judgment, sufficiently and correctly presents the law, and cannot in any respect be said to be calculated to confuse or mislead the minds of a jury. The words in said charge objected to by defendant's counsel, and italicised in their brief, rendered the charge more favorable to the defendant than if they had been omitted, and, furthermore, the qualification expressed by these words is a correct one, and was not improperly inserted in the connection in which they are found.

Because of the errors and omissions in the charge of the court upon the issue of self-defense hereinbefore mentioned, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered October 28, 1885.]